NOTICE

Decision filed 06/10/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260027

NOS. 5-26-0027, 5-26-0028, 5-26-0029 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* A.H., E.H., and G.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Williamson County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 24-JA-20, 24-JA-21, |
| v. | ) | 24-JA-22 |
| | ) | |
| Anthony H., | ) | Honorable |
| | ) | Amanda Byassee Gott, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Boie and Bollinger concurred in the judgment and opinion.

**OPINION**

¶ 1 Respondent, Anthony H. (Father), appeals the January 8, 2026, decision terminating Father's parental rights. Father claims that the circuit court abused its discretion when it failed to continue the termination proceedings to require the Department of Children and Family Services (DCFS) to investigate Father's relatives for potential placement as required by Public Act 103-1061 (eff. Feb. 5, 2025), commonly known as the Kinship in Demand (KIND) Act. Father additionally claims that the circuit court erred in finding that DCFS complied with the KIND Act. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3 On April 22, 2024, the State filed petitions for adjudication of wardship under the Juvenile

1

Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) for A.H., born August 13, 2020, E.H. born May 15, 2023, and G.H. born April 17, 2024. The State alleged neglect of the minors pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2024)) claiming that Ebbe F. (Mother)[1] and Father neglected the minors because G.H. was born substance-exposed, Mother admitted to methamphetamine use and had tested positive for methamphetamine and amphetamine during several prenatal appointments, Father admitted to methamphetamine use, and Father tested positive for methamphetamine use on April 17, 2024.

¶ 4    The children were removed from Father's care on April 22, 2024, and the circuit court granted the guardianship administrator of DCFS authority to place the minors. The children were placed together with their paternal great-grandmother. The minors were subsequently adjudicated neglected on June 20, 2024, and a dispositional order was entered on July 18, 2024.

¶ 5    On November 1, 2024, the children were removed from their paternal great-grandmother's care, upon her request. The children were placed in three separate households. E.H. was placed in a fictive kin household in Herrin, Illinois. G.H. was also placed with fictive kin, but in Carterville, Illinois. A.H. was initially placed with fictive kin for a day and then moved to another home until November 11, 2024, when he was placed in a traditional foster home, in Mulkeytown, Illinois.

¶ 6    The circuit court, on January 9, 2025, held a permanency hearing and heard testimony from Katrina Ortiz, a child welfare specialist with Lutheran Social Services of Illinois (Agency),[2] who had provided a report for the court. At the commencement of the hearing, the circuit court noted that "all three children are in separate homes," which concerned the court. The hearing proceeded

---

[1]Mother surrendered her rights to the minor children and is not a party to this appeal.
[2]Lutheran Social Services of Illinois is an "agency" as defined by section 1-3(3) of the Juvenile Court Act as it is a private, nonprofit childcare and social service provider authorized and licensed by DCFS to provide foster care placement. See 705 ILCS 405/1-3(3) (West 2024).

and Ortiz provided details regarding the efforts and progress made by Father and Mother in relation to their respective service plans. After the questioning by the interested parties, the circuit court requested further details regarding the placement of the children and interjected, stating, "Tell me about the placement situation. Why is it that we're not able to have any of the siblings together?" Ortiz responded that "there wasn't a home that would take all three of them." The circuit court asked Ortiz whether there had been any continuing discussions with existing foster parents, to determine if one of them might accept another child. Ortiz responded, "No." The circuit court then questioned whether Father or Mother had been asked for the names of relatives who might accept the children so that they could be together. Ortiz informed the circuit court that the parents had not provided names or phone numbers of family members who may be willing take the children. The following then transpired:

> "THE COURT: Have there been continued discussions with any of the foster parents to see if any of that has changed and anyone is able to take more than one of the children instead of having three children in three separate homes?
>
> ORTIZ: No.
>
> THE COURT: All right. So the Court is ordering the [A]gency to continue to follow up and do your job and follow the priorities, which will be for these children to be together, if at all possible, whether that be all three, whether that be two of them, whatever the situation might have been temporarily whenever the situation came up and the children had to be, you know, immediately changed and placed. The [A]gency needs to continue to further investigate that issue and to continue to look for placement options where these children or some portion of them could be together.

3

Parents, I encourage you if there are family members, relative placements, if there are fictive kin, as we call it, other people who might not be blood relations but that are close to you or know you or your family or your children, if there are any of those people that you have not listed and given information to the [A]gency about for whatever reason, I encourage you to make sure that you are being forthcoming and giving all of the information that you can to the [A]gency to be able to find placement for your children. I would think for you it would be important for the children to have the opportunity to be together as siblings. I think it's important for the children and that's what's in their best interest."

¶ 7       At the conclusion of the hearing on January 9, 2025, the circuit court directed the Agency to focus its efforts on placing the children together with a relative placement. This order was consistent with the anticipated effective date of the KIND Act. This legislation prioritized placement of children with relatives and directed DCFS, or its provider, to adopt a kin-first approach.

¶ 8       On March 28, 2025, the Agency submitted a permanency report that detailed the lack of progress by Father and Mother. The well-being of the children was also set forth with particularity. The report indicated that the Agency had requested Father and Mother provide "the names of any possible relative/fictive kin placement resources so the Agency could explore options to have all three children placed together." In its concluding paragraph, the Agency indicated that the placement of the children "together remains a primary goal," but no resources had been identified that would allow for the children to be together.

¶ 9       A permanency hearing was held on April 10, 2025, and the circuit court reviewed the report from the Agency. At the beginning of the hearing, the circuit court again noted that the children

4

were not placed together. The court went on to acknowledge that the "agency has been looking into seeing if we could get any of the children moved together." And the court indicated its appreciation that the Agency continued to work on the placement issue. At the conclusion of this hearing, the circuit court changed the goal to substitute care pending determination of termination of parental rights.

¶ 10    The State filed a petition for termination of parental rights and for appointment of guardian with power to consent to adoption on June 27, 2025, alleging that Father failed to protect the children from conditions within his environment injurious to the welfare of the children (750 ILCS 5/1(D)(g) (West 2024)), Father failed to make reasonable efforts to correct the conditions that were the basis for removal of the children during any nine-month period following the adjudication or the neglected minor (750 ILCS 50/1(D)(m)(i) (West 2024)), and Father failed to make reasonable progress towards the return of his minor children during any nine-month period following the adjudication of the neglected minor (750 ILCS 50/1(D)(m)(ii) (West 2024)). The State relied on the following nine-month periods: June 20, 2024, through March 20, 2025, and August 20, 2024, through May 20, 2025.[3] On July 4, 2025, Father was incarcerated in the Williamson County Jail on murder charges.

¶ 11    The Agency filed a permanency report on July 9, 2025. There was no mention in that report of any efforts being made by the Agency to locate relatives for placement of the minors together. On July 10, 2025, the circuit court held a permanency hearing. At that time, the circuit court was concerned with the KIND Act compliance and requested that the Agency provide an update regarding the placement of the children and whether any progress had been made placing the children together. Ortiz confirmed that the three siblings remained in separate households. Ortiz

---

[3]An amended petition for termination of parental rights was filed the same date.

5

explained that Mother and Father had been asked whether they had relatives who were willing to accept placement of the children, but the parents had not provided the names of any relatives. The circuit court then addressed Father and inquired whether he was aware of any relatives that would be "possible placements for the minor children." Father responded to the circuit court that he had family in Michigan and believed that his aunt, grandmother, or another family member in Michigan would be willing to take in the children. The circuit court then directed the Agency to have a conversation with Father about possible relative placements, stating: "Even if that includes out of State possible placements." The circuit court went on to state,

> "Well, as I keep telling many agencies today, the KIND Act is in effect. That means that there is an obligation on the part of the [A]gency to be continuing to make diligent or reasonable efforts to engage in ongoing family finding and relative, possible placements and familial ties even for purpose of visitation. So, the [A]gency needs to thoroughly speak with both parents and discuss any and all possible options and look into any possible relative placements."

¶ 12    The circuit court entered a written "Order On Family And Relative Engagement Pursuant To The KIND Act" on July 10, 2025. The order was a form that was used by the circuit court. The order indicated that the children were originally placed with their paternal great-grandmother, but they were removed from her care and were not placed in the care of a relative. The order indicated placement of the children with fictive kin. The circuit court checked two boxes. The first finding noted by the circuit court stated, "[DCFS]: has made diligent and reasonable efforts to engage in ongoing family finding and relative engagement—But see below—further efforts need to be made." The second finding by the circuit court indicated, "[DCFS] is ordered to file a modified Ongoing Family Finding and Relative Engagement Plan consistent with the court's findings." The

6

finding made by the circuit court was as follows: "parents are now listing other potential relatives which [A]gency should investigate."

¶ 13                    A. September 11, 2025—Termination Hearing (Continued)

¶ 14    A termination hearing was set on September 11, 2025. The Agency had filed a permanency report dated September 10, 2025. In its report, the Agency had a section called "Information Pertinent to KIND Act." The Agency detailed its efforts to find relatives who might be willing to accept placement of all three children, together. Four relatives had been initially identified as potential placement resources: paternal grandfather, paternal grandmother, a paternal aunt who resided in Michigan, and an additional relative. The report indicated that Ortiz had only been successful in making contact with Susan C.B., Father's aunt in Michigan, and she was not willing to accept all three children. Susan was willing to consider accepting the oldest child, but Ortiz's report indicated it would not be in the best interest of the older child to be moved out of state and over a seven hour car ride from his siblings. The report concluded that all three children were

> "stable in their placements & closely bonded with their caregivers. All three caregivers are committed to providing the children with permanency through adoption if reunification is unsuccessful, & the caregivers have demonstrated a willingness & motivation to ensure that the children see one another frequently & spend time together to support their sibling bond. The three caregivers have all demonstrated an ability & willingness to provide the children with an appropriate level of care, safety & support during the last 10 months. The children are thriving in their current placements & are obviously bonded with their caregivers. [The Agency] does not intend to pursue placement with the identified relative at this

7

time, although the relative shall remain a support & resource should circumstances arise that require reassessment."

¶ 15 At the hearing on September 11, 2025, counsel for Father moved for a continuance based upon the Agency's failure to make sufficient efforts to comply with the KIND Act. The circuit court reviewed the details set forth in the "Information Pertinent to KIND Act" with Sarah Murphy, the Agency supervisor. Murphy testified that the Agency had only spoken to one potential relative placement and determined that placement with that relative was not an option because she would only consider accepting placement of one child. Murphy informed the circuit court that the Agency's "family findings specialist" had called the numbers provided by Father in July and left a message for the three other potential relative placements. Murphy clarified that she believed that only one phone call had been made to each of the potential relatives, and no follow up phone call had been made by the Agency. The caseworker who made the phone call was not present in court to verify what efforts had been made.

¶ 16 Counsel for Father then informed the circuit court that he was able to contact a relative of Father, without any issue, who was willing to accept placement of the children, and he had provided the information regarding that relative to the Agency. That relative later informed counsel that she was never contacted by the Agency. The circuit court then addressed the Agency and stated, "Well the KIND Act is obviously new, although, the obligations of the [A]gency I don't think are new." The circuit court indicated that the Agency should have been familiar with guidelines that were similar to those now set forth in the statute. The circuit court went on to admonish the Agency as follows:

"I am frustrated that I have a case worker and a supervisor here and neither one of you made any of the calls. So, the person that made the calls and actually has

8

detailed information isn't here. Doesn't have any affidavit that they have provided to the Court as to what detailed efforts they made to comply with the Kind Act. And I have [Counsel for Father] as an officer of the Court saying he picked up the phone and called someone in 30 seconds who answered the phone. And what I'm hearing from the [A]gency is that as far as you know from third hand information, someone potentially made one phone call and potentially left one voicemail. That does not sound like due and diligent efforts to me on the part of the [A]gency to comply with the Kind Act."

¶ 17    The circuit court then granted Father's motion to continue the termination and permanency hearing. The circuit court additionally indicated to the Agency, "I want to be very clear that I need a detailed report and/or affidavit of what efforts the [A]gency has made pursuant to the KIND Act to contact any of the family relatives that have been given to you by the parents." The court ordered that the report be filed at least seven days prior to the termination hearing, which was scheduled for November 6, 2025. The circuit court further suggested that a witness, who had actual knowledge of the Agency's efforts, be available in person or by Zoom to testify on that hearing date. The circuit court then informed Father that it was his last opportunity to provide familial information to the Agency and that the circuit court would not grant any further continuances.

¶ 18    A court appointed special advocates (CASA) representative filed a report with the circuit court on October 28, 2025. The CASA documented a contact she had with Ortiz, who indicated the great aunt in Michigan was a possible placement for the children. The CASA reported that the aunt lives with her sister in a three-bedroom house and indicated she would be willing to take all three children. According to her conversation with Ortiz, the CASA reported that a criminal background check on the aunt was "clear" and Ortiz was preparing to submit additional

information to complete Michigan background checks. The CASA's "analysis of situation" included the following:

> "Although a distant relative of [Father] in Michigan has communicated her willingness to take placement of all three children, she has not had a past relationship with any of the children and has not reached out, despite reporting she knew they were in foster care. This CASA believes it is in the children's best interest to remain in their current placements, where they have built stability and maintained sibling bonds over the last 12 months, and be adopted if parental rights are severed."

¶ 19    A permanency report, dated October 28, 2025, and authored by Ortiz, was submitted to the circuit court and included the paragraph, "Information Pertinent to KIND Act." Ortiz reported that Father had identified multiple relatives who were potential placements after the July 10, 2025, permanency hearing and the Agency had reached out to several of the individuals. The Agency was successful in contacting Erin T., Father's aunt, to determine whether she was a potential relative placement option. Erin lived in Michigan and had never met the children; however, she was willing to pursue placement of all three children in her care. Illinois and out-of-state criminal history searches were conducted, and Erin did not have a significant criminal history. Ortiz reported the Agency had prepared and submitted an "Interstate Compact for Placement of Children (ICPC)" request to conduct a home study and determine whether placement with Erin was safe and appropriate. No additional details of Erin as a placement were provided in the report. Ortiz further reported that the three children were thriving in their current placements and had bonded with their caregivers. The Agency elected to file this report in response to the circuit court's order of September 11, 2025, and did not provide an affidavit.

10

¶ 20                    B. November 6, 2025—Termination Hearing (Reset)

¶ 21    The termination hearing was set on November 6, 2025. Father's counsel requested an additional continuance and requested the opportunity to question the caseworker on placement issues. The circuit court allowed testimony from the Agency's permanency supervisor, Murphy, and the circuit court initiated the questioning by asking Murphy for a "summary status of where we're at from the [A]gency's position."

¶ 22    Murphy testified that counsel for Father had provided the Agency with the name and contact information for Erin, Father's paternal aunt. Erin lives in Michigan with her adult sister. The Agency made contact with Erin, who was willing to accept placement of all three children in her household. A criminal background check revealed no barriers. Because Erin lived in Michigan, an ICPC request was submitted as the Agency was limited on what further assessment could be done on a household in Michigan. The Agency, nevertheless, recommended that a placement change should not be pursued because the children did not have an existing relationship with Erin. The children had been placed in their current foster homes for approximately one year, the children were stable in their current placement, and their caregivers were committed to pursuing adoption.

¶ 23    On cross-examination of Murphy, she testified that the Agency did not have any reason to believe that Erin would be unable to provide for the medical needs of the children. The assessment was limited as no in-person or home visit had been completed because Erin lived out of state. Murphy indicated that the interstate compact was applicable and that was the process through which further assessment of Erin as a placement option would occur. Murphy was not aware of any way to pursue relative placement without ICPC. When asked by Father's counsel whether Erin has priority under the KIND Act because she is a "blood relative," Murphy explained that under the KIND Act, "I believe that [Erin] is given priority in terms of the need to prioritize assessment

11

of her as a relative, and I believe that we have satisfied the requirement to assess the relative option to the greatest extent that we're able to at this time." Murphy further opined that the Agency had exhausted their options to facilitate placement of the children together and that the ICPC review would take six to nine months.

¶ 24 The circuit court questioned Murphy on whether Erin had been aware that the children were removed from Father's care. Murphy testified that Erin had been aware of the children's removal, but Murphy was unsure of why Erin had not contacted the Agency earlier.

¶ 25 After Murphy's testimony concluded, Father renewed his request to continue the termination hearing until a determination was made on where the children would ultimately be placed because the ICPC request remained pending. Father argued that in January 2025, the circuit court instructed the Agency to look into placing the children together; in July of 2025, the circuit court instructed the Agency to include efforts regarding family placement in their report; and no efforts had been made before the September 2025 hearing date. Even though the Agency received family contact information, counsel for Father argued that he still had to contact the Agency to encourage the Agency to initiate contact with Father's relatives. Father argued that the Agency failed to make sufficient efforts to identify family members and had not met its obligations under the KIND Act.

¶ 26 The State objected to a continuance and requested that the circuit court proceed with the termination hearing. The State additionally pointed out that on September 11, 2025, the circuit court stated that no more continuances would be granted in this case. The guardian *ad litem* (GAL) did not believe that the continuance should be granted and stated that "permanency is being hijacked because of the KIND Act."

¶ 27 The circuit court denied the motion to continue as it related to the KIND Act, it also found

12

that the Agency had met its obligations under the KIND Act, and the circuit court found that KIND Act compliance did not justify continuing the termination hearing. The circuit court considered that DCFS would not be allowed to accept a direct consent from Father to place the children with Erin in Michigan, nor would Erin have standing to pursue adoption because the children were not placed in her care. The circuit court adjourned to allow Father the opportunity to review and consider signing consent forms for surrendering his parental rights. After discussion with his counsel, Father elected to proceed with a termination hearing, which was rescheduled for December 11, 2025.

¶ 28    The Agency filed a permanency report dated December 2, 2025. Once again, the Agency reported its attempts to contact Father's relatives in Michigan. Most notable was Erin, who had been contacted, according to the report, on October 10, 2025. Erin had never met the children, nor had she contacted the Agency to inquire about them. Nevertheless, the report indicated that she had cleared the criminal background checks, and the Agency had submitted an ICPC to initiate further assessment of Erin as a potential placement resource. The report went on to indicate that the children were in separate placements, but all three caregivers lived in close proximity to one another and were committed to providing the children with permanency through adoption. The report concluded that the "children were thriving in their current placements & are obviously bonded with their caregivers."

¶ 29                    C. December 11, 2025—Termination Hearing (Fitness)

¶ 30    On December 11, 2025, the circuit court convened a permanency hearing and a hearing on termination of Father's parental rights. Father requested another continuance based on the Agency's failure to comply with the KIND Act. Father argued that the ICPC had not been submitted until October 30, 2025, even though there was discussion during a July hearing about a

13

potential placement with a relative in Michigan. The ICPC investigation was ongoing, and a request for additional information from the DCFS counterpart in Michigan was pending. Father additionally indicated that Erin was present in court and had made the trip, in part, to impress upon the court how serious she was about seeking placement of all three children in her care. Father's counsel argued that the outcome of the ICPC process could determine whether Father might decide to sign surrenders. The State objected to the continuance, and the GAL argued that placement of the children in Michigan was not relevant to whether Father's paternal rights should be terminated.

¶ 31    The circuit court considered the length of time involved in the ICPC process and did not believe that it was in the best interest of the children to wait six months to a year for the ICPC request to be completed. The motion to continue was denied, and the circuit court proceeded and heard testimony regarding the fitness portion of the termination hearing.

¶ 32    After considering the testimony and evidence presented, the circuit court found that the State had proven that Father failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children and failed to make reasonable progress towards the return of the children during any nine-month period following the adjudication of neglect or abuse. The circuit court indicated that it was ready to proceed to a best interest hearing. Father renewed his motion to continue after the fitness determination and argued that the ICPC issue and placement of the children was relevant to the best interest hearing. Father reminded the court that the aunt from Michigan was present and preferable to take placement of the three children under the KIND Act. Father argued that the best interest factors that the circuit court was required to consider would be irrelevant if, ultimately, these children were moved pursuant to the KIND Act. The State again objected to the continuance.

¶ 33    The circuit court then addressed the Agency and requested an update on the ICPC request.

14

Murphy informed the circuit court that the ICPC application had been submitted, but she was unable to provide an estimated time frame for approval. Regardless of the information received from the ICPC, the Agency did not intend to pursue placement with Erin. The circuit court inquired whether the Agency had consulted with its legal counsel concerning this position with regard to the KIND Act and placement considerations. Murphy responded in the affirmative, and the circuit court noted that legal counsel for DCFS was not present in court. The circuit court then granted the motion to continue in part due to Father's request to continue and in part because it was too late in the day for the best interest hearing. The best interest hearing was reset for January 8, 2026.

¶ 34        D. January 8, 2026—Termination Hearing (Best Interest)

¶ 35    The circuit court convened on January 8, 2026, and requested a status update on compliance with the KIND Act before proceeding with the best interest hearing. Murphy was sworn in as a witness and the circuit court inquired about the status of the ICPC. Murphy testified that the ICPC request remained "outstanding and pending." The Agency had received a response requesting additional information, including the children's educational and medical records. Murphy anticipated that the requested information would be submitted within the next two weeks but was unable to give an estimated time frame for an expected response thereafter. With regard to Erin, the Michigan relative, Murphy had no updates. The circuit court then inquired whether Erin was allowed to visit the children when she was in southern Illinois for the prior court date. The Agency acknowledged that it made no effort to allow Erin to visit with the children while she was present in Illinois. Further, Erin had indicated she would be willing to make arrangements for visitation, but the Agency had not made any efforts to facilitate a visit since the last court hearing.

¶ 36    On cross-examination, Murphy testified that she was first aware that Erin was interested in having the children placed with her on October 8, 2025. Murphy additionally testified that Erin

15

was willing to take in all three children, she had family support in Michigan, and she had passed background checks in Illinois and Michigan. After Murphy provided an update on the ICPC request, the circuit court asked whether the parties were ready to proceed with the best interest hearing. Counsel for Father answered in the affirmative and did not renew his motion for continuance.

¶ 37 During the best interest hearing, testimony was provided by the children's caregivers regarding their relationships with the children and efforts made to facilitate relationships with the siblings. Each of the foster families indicated that they were willing to pursue adoption.

¶ 38 Ortiz testified that the children were initially placed with their great-grandmother, but their great-grandmother became overwhelmed and requested that the children be removed from her care. Mother and Father were asked if any other family member would be willing to accept the three children, and they did not provide any names of family members. Counsel for Father questioned Ortiz on her efforts to contact Erin and whether she had submitted an ICPC request for any other relative. The ICPC request was only submitted for Erin, and Ortiz testified she was not informed about Erin until October 8, 2025.

¶ 39 The circuit court then addressed Ortiz's efforts in contacting Erin. The permanency report filed in September of 2025, listed the names of relatives, but Erin was not included. The circuit court inquired whether one of Father's relatives provided information on Erin during the investigation. Ortiz testified that she received Erin's information after Father's counsel provided contact information to her supervisor.

¶ 40 Murphy testified that she was the supervisor for Ortiz. Murphy indicated she had been assigned to this case for approximately eight months. As far as placement possibilities, Murphy was not aware of any relatives, besides Erin, who were willing or able to accommodate the

16

placement of the three children. The children had been in their placements since early November 2024 and had developed a bond with their caregivers. She stated that the children are "thriving in terms of their emotional and mental well-being." Murphy was concerned that moving the children would be disruptive. Murphy additionally believed that it was in the best interest of the children that Father's rights be terminated.

¶ 41   The circuit court questioned Murphy on what efforts had been made by the Agency to find familial placements after the removal of the children from their initial placement with their great-grandmother. Murphy believed that both parents were contacted and no relatives were identified at that time. Murphy was unaware of any specifics regarding dates and times and who was contacted regarding relative placements. Murphy acknowledged that the Agency's documentation as to whether the inquiries continued with the parents was "not at the consistency of regular monthly conversations with the parents." The circuit court further questioned Murphy, asking whether a caseworker had informed Father that the family member did not need to be local and that placement with an out-of-state relative was an option. Murphy was not aware if Father had been provided with that information.

¶ 42   Murphy additionally testified that the Agency did not believe that it was in the interest of the children to disrupt an 11-month placement and move the children into the care of a family member. Furthermore, additional information was needed and an "ICPC does not go fast." The State rested after Murphy testified.

¶ 43   Erin testified on Father's behalf. She indicated that Father was her nephew's son. Erin lived in Michigan with her sister, and she had an adult son who lived 20 minutes away. Erin identified other family members who lived close to her. Father's grandmother lived three minutes from Erin's home, and Father's other great-aunt lived approximately 15 minutes from Erin's home.

17

¶ 44　Erin explained why she had not contacted DCFS sooner to report that she was a willing placement for the children. Erin was aware that the children were removed from Father's care in the spring of 2024. She believed they had been placed with "Father's mother," who was told that if caring for the children was "too much," Erin was willing to care for the children. Erin was also in contact with another family member, who had been in contact with DCFS. Erin believed that if there was a need to place the children with another caregiver, she would have been informed. Erin was aware that the children's grandfather had also attempted to contact DCFS at the end of 2024. After DCFS contacted Erin, she had a difficult time reaching the Agency and had not provided information on being an option for placement until October 2025. Erin had not been contacted by the equivalent of DCFS in Michigan.

¶ 45　Erin testified that she was able to accommodate all three children in her home. She had not met the children, but "there are lots of family members in the area" who had a relationship with the children. The children's grandfather, who also lived in Michigan, helped with the children when they were initially placed in their great-grandmother's care. Erin acknowledged that because she did not know the children, she had not been able to assist in helping with their development or achieve the various milestones contemplated by the best interest factors. See 705 ILCS 405/1-3(4.05) (West 2024). Father rested after Erin's testimony concluded.

¶ 46　The circuit court heard the arguments of counsel and considered that even though it "often has testimony and evidence regarding where the children are placed, whether or not those placements are adoptive placements, the Court does not have to have that information to be able to find that it's in the best interest for parental rights to be terminated." The circuit court additionally considered the statutory best interest factors under section 1-3(4.05) the Juvenile Court Act and focused on "the least disruptive placement." The circuit court found that the children

18

had been placed with their foster placements since November 2024. Additionally, the circuit court acknowledged that the KIND Act was in effect, as of July 2025, and that the children had been with their foster placements for approximately eight or nine months and had formed bonds. Erin did not have a relationship with the children, and she would have been an option "if we were earlier on in this case." The circuit court additionally found that,

> "the [A]gency did very little to make inquiry, made very—made very little efforts to make that clear to the parents so they understood why it was important to give them names and that it didn't just need to be local names in the case. *** I don't think the [A]gency clearly followed up with the relatives whose names they were given to ask them about other relatives because if they had done so, they would have been given [Erin's] contact information much earlier in this case."

The circuit court went on to question whether these circumstances would have changed the outcome, and the court concluded, "I can only deal with the here and now and the evidence that is presented before me at this point in time."

¶ 47    The circuit court entered a written order finding Father was unfit and that it was in the best interests of the minor children for Father's rights to be permanently and forever irrevocably terminated. The children were placed in the guardianship of the guardianship administrator for DCFS, and the guardian was vested with the power to consent to the adoption of the minors.

¶ 48    The circuit court additionally entered a permanency order on January 8, 2026, which indicated that the circuit court considered the current "Ongoing Family Finding and Relative Engagement Plan." In its written order, the circuit court made KIND Act findings regarding DCFS and checked the box that stated DCFS "has made diligent and reasonable efforts to engage in ongoing family finding and relative engagement. Further efforts are *excused* because they are futile

19

or not in the minor's best interest." (Emphasis in original.) The court's order went on to find that the minors had not been placed in the care of a relative because the named relative was out of state and the ICPC had not yet passed, and the circuit court considered that the children had been with their current foster parents for over one year and had bonded with their foster parents. This appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50    On appeal, Father argues, that the circuit court abused its discretion when it failed to continue the hearing on the State's petition to terminate Father's parental rights to allow for DCFS to investigate the potential placement of his three children with a relative. As a result of the circuit court's failure to grant the continuance, Father argues that the circuit court erred in proceeding with the fitness hearing. Had the circuit court granted Father's motion to continue pursuant to the Agency's lack of compliance with the KIND Act, Father would not have been found unfit and DCFS would have been required to comply with its obligations under the statute. Father requests that we vacate the January 8, 2026, written decision terminating Father's parental rights and remand this case for further proceedings pursuant to the KIND Act.

¶ 51    " 'Parents have a fundamental due process right to the care, custody and control of their children, but that right is subject to termination.' " *In re J.B.*, 2014 IL App (1st) 140773, ¶ 42 (quoting *In re A.W.*, 397 Ill. App. 3d 868, 872 (2010)). Termination proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2024). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one

20

or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the circuit court finds a parent to be unfit, then the cause proceeds to a determination of whether it is in the best interest of the child for the parent's rights to be terminated. See 750 ILCS 50/1(D) (West 2024); *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000). At this stage of the proceedings, the circuit court's focus shifts to the best interests of the children and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. A finding that termination is in the child's best interest will not be reversed unless it is contrary to the manifest weight of the evidence. *In re M.F.*, 326 Ill. App. 3d 1110, 1115-16 (2002).

¶ 52 Several months after the children were removed from Father's care, the KIND Act was signed into law. The KIND Act "creates the statutory vision and authority for [DCFS] to execute a kin-first approach to service delivery and directs the juvenile courts to provide necessary oversight of [DCFS's] obligations to maintain family connections and promote equitable opportunities for youth and families to thrive with relational permanence." Pub. Act 103-1061, § 2 (eff. Feb. 5, 2025). The KIND Act created obligations for DCFS to investigate and locate family members for prospective placement. The General Assembly did not include an express private right for enforcement of the KIND Act by a parent.

¶ 53 Prior to the effective date of the KIND Act, DCFS was already required to comply with section 7 of the Children and Family Services Act in placing any child. See 20 ILCS 505/7 (West 2024). There was a preference in the statute, that DCFS shall place children with their siblings unless the placement is not in each child's best interest or if placement together is not possible. 20 ILCS 505/7(a-5) (West 2024). After the passage of the KIND Act, certain amendments were made

21

to section 7 of the Children and Family Services Act, effective July 1, 2025, to implement the kin-first approach to service delivery. For instance,

> "[i]n placing a child under [the Children and Family Services Act], [DCFS] *shall* place a child with a relative if [DCFS] determines that the relative will be able to adequately provide for the child's safety and welfare based on the factors set forth in [DCFS's] rules governing such placements, and that the placement is consistent with the child's best interests, taking into consideration the factors set out in subsection (4.05) of Section 1-3 of the Juvenile Court Act of 1987." (Emphasis added.) 20 ILCS 505/7(b) (West 2024).

"Shall" replaced the word "may" in the prior version. This changed the prior permissive approach to a directive that DCFS place a child with a relative.

¶ 54 The statute dictates that when it first assumes custody of a child, DCFS "shall make reasonable efforts to identify, locate, and provide notice to all adult grandparents and other adult relatives of the child who are ready, willing, and able to care for the child." 20 ILCS 505/7(b) (West 2024). Section 7(b) was amended to require DCFS to complete initial "family finding and relative engagement efforts," defined as

> "conducting an investigation, including, but not limited to, through a computer-based search engine, to identify any person who would be eligible to be a relative caregiver *** and to connect a child, consistent with the child's best interest, who may be disconnected from the child's parents, with those relatives and kin in an effort to provide family support or possible placement." 20 ILCS 505/7(b)(1) (West 2024).

Thus, DCFS is required to "conduct an investigation in order to identify and locate all grandparents, parents of a sibling of the child, if the parent has legal custody of the sibling, adult

22

siblings, other adult relatives of the minor including any other adult relatives suggested by the parents." 20 ILCS 505/7(b)(1) (West 2024). Furthermore, DCFS

"shall make diligent efforts to investigate the names and locations of the relatives, including, but not limited to, asking the child in an age-appropriate manner and consistent with the child's best interest about any parent, alleged parent, and relatives important to the child, and obtaining information regarding the location of the child's parents, alleged parents, and adult relatives." 20 ILCS 505/7(b)(1) (West 2024).

¶ 55 DCFS, is additionally required, under section 7(b)(2), and "[i]n accordance with Section 471(a)(29) of the Social Security Act," to

"make diligent efforts to provide all adult relatives who are located with written notification and oral notification, in person or by telephone, of all the following information:

(i) the minor has been removed from the custody of the minor's parent or guardian; and

(ii) an explanation of the various options to participate in the care and placement of the minor and support for the minor's family, including any options that may expire by failing to respond. The notice shall provide information about providing care for the minor while the family receives reunification services with the goal of returning the child to the parent or guardian, how to become a certified relative caregiver home, and additional services and support that are available in substitute care. The notice shall also include information regarding, adoption and subsidized guardianship assistance options, health care coverage for youth in care under the medical

23

assistance program established under Article V of the Illinois Public Aid

Code, and other options for contact with the minor, including, but not

limited to, visitation. Upon establishing [DCFS's] kinship navigator

program, the notice shall also include information regarding that benefit."

20 ILCS 505/7(b)(2) (West 2024).

DCFS was also required to adopt or amend its existing rules to implement the requirements of this

subsection, including what constitutes "diligent efforts." See 20 ILCS 505/7(b)(1) (West 2024).

Pursuant to the statute's mandate, DCFS has defined "diligent efforts" as:

"conscientious attempts to accomplish all aspects of intervention with respect to

thoroughness, timeliness, availability, and responsiveness. Diligent efforts in the

context of family finding and relative engagement may include, but is not limited

to interviewing the youth in care's parents, interviewing the youth in care if age and

developmentally appropriate, interviewing identified relatives regarding other

relatives not yet identified, conducting computer-based searches, and assessing the

relative for certification." 89 Ill. Adm. Code 415.30 (2025).

¶ 56    If DCFS determines that placement with an identified relative does not meet requirements

or placement is not in a child's best interests, then DCFS must:

"document the basis for that decision, maintain the documentation in the child's

case file, inform the identified relative of the relative's right to reconsideration of

the decision to deny placement with the identified relative, provide the identified

relative with a description of the reconsideration process established in accordance

with subsection (*o*) of Section 5 of this Act, and report this information to the court

in accordance with the requirements of Section 2-27.3 of the Juvenile Court Act of 1987." 20 ILCS 505/7(b-5)(1) (West 2024).

¶ 57    Notably, the statute generally required DCFS to "document its efforts to identify, locate, and provide notice to such potential relative placements and maintain the documentation in the child's case file." 20 ILCS 505/7(b) (West 2024). DCFS was also obligated to adopt rules "setting forth specific criteria as to family finding and relative engagement efforts under this subsection (b)." 20 ILCS 505/7(b)(1) (West 2024).

¶ 58    The Juvenile Court Act was amended following the passage of the KIND Act. Specifically, section 2-27.3 regarding ongoing family finding and relative engagement was added and became effective on July 1, 2025. See 705 ILCS 405/2-27.3 (West 2024). Under section 2-27.3(a)(1),

"[DCFS] shall make ongoing diligent efforts, to the fullest extent consistent with the minor's best interest, to engage in ongoing family finding and relative engagement for the purposes of:

(A) establishing and supporting lifelong connections for the minor by building a network of sustainable and supportive relationships that allow the minor to experience a sense of belonging through enduring, life-long relationships with family, extended family, and other caring adults; and

(B) for minors who are not in a placement likely to achieve permanency, identifying relatives who may be willing and able to care for the minor and provide permanency for the minor.

Efforts to identify, locate, and engage relatives to assist in supporting and establishing lifelong connections for the minor are required, *consistent with the best interests of the minor*, even if the minor is placed with a relative, recognizing it may

25

be in the minor's best interest to maintain connections with different relatives, and a relative's capacity to provide connection and support, may change over time." (Emphasis added.) 705 ILCS 405/2-27.3(a)(1) (West 2024).

¶ 59    Father wanted his children to be placed together with a relative who was willing to accept placement of all three children. Father moved to continue the termination hearing of his parental rights on multiple occasions for the Agency to complete its inquiry into relative placement pursuant to the obligations required by the KIND Act. "It is within the juvenile court's discretion whether to grant or deny a continuance motion, and the court's decision will not be disturbed absent manifest abuse or palpable injustice." *In re K.O.*, 336 Ill. App. 3d 98, 104 (2002). "The denial of a request for a continuance is not a ground for reversal unless the complaining party has been prejudiced by such denial." *In re Jamarqon C.*, 338 Ill. App. 3d 639, 644 (2003). Father claims that the circuit court's failure to grant a continuance prejudiced him, as he was forced to face termination proceedings which resulted in the January 8, 2026, order. Father claims the circuit court abused its discretion when it failed to hold the Agency accountable under the KIND Act.

¶ 60    Father's three children were initially placed together in the care of a relative when they were removed from Father's care on April 22, 2024. DCFS, through the Agency, placed the children with a paternal great-grandmother until November of 2024, when the children were removed from her care at her request. During the permanency hearing on January 9, 2025, even before the KIND Act went into effect, the circuit court questioned the Agency as to why the three children had not been placed together. See 20 ILCS 505/7(a-5) (West 2024). The Agency caseworker, Ortiz, indicated it could not find a placement for all three children. The circuit court asked Ortiz whether there had been any questioning of the parents regarding placement of the children with relatives. The response by Ortiz was that the parents had not provided any names. In

26

response to its questions, the circuit court ordered the Agency "to continue to follow up and do your job and follow the priorities, which will be for these children to be together, if at all possible." The circuit court directed the Agency to "continue to further investigate that issue and to continue to look for placement options where these children or some portion of them could be together." After admonishing the Agency, the circuit court directed its attention to the parents and encouraged them to provide the Agency with the names of any family members, relative placements, or fictive kin who might be able to accept placement for the children. The court indicated that placing the minors together would be in their best interests.

¶ 61 On March 28, 2025, after portions of the KIND Act had become effective, the Agency submitted a permanency report that included references to the well-being of the children. The report indicated that the Agency had requested Father and Mother provide "the names of any possible relative/fictive kin placement resources so the [A]gency could explore options to have all three children placed together." The Agency concluded that no resources for placement together had been identified. The circuit court held a permanency hearing on April 10, 2025, and again, the circuit court inquired regarding the placement of the children.

¶ 62 On July 1, 2025, the remaining portions of the KIND Act became effective. The Agency filed a permanency report dated July 9, 2025, which failed to mention any efforts being made by the Agency to locate relatives for placement of the minors together. The failure to identify and document any efforts to investigate relative placement ignored the mandate of the KIND Act.

¶ 63 During the July 10, 2025, permanency hearing, the circuit court was concerned about the Agency's compliance with the KIND Act and requested an update related to family and relative engagement requirements of section 7 of the Children and Family Services Act (20 ILCS 505/7 (West 2024)) and section 2-27.3 of the Juvenile Court Act (705 ILCS 405/2-27.3 (West 2024)).

27

At that time, the Agency had only asked Mother and Father if they had relatives who were willing to accept placement of the children. Ortiz claimed that Mother and Father had failed to provide the names of relatives that the Agency could investigate as placement options. The circuit court admonished the Agency by stating, "Well, as I keep telling many agencies today, the KIND Act is in effect. That means that there is an obligation on the part of the [A]gency to be continuing to make diligent or reasonable efforts to engage in ongoing family finding and relative, possible placements." According to the order entered that date, the parents were providing names. Father informed the circuit court of multiple family members in Michigan, who he believed would be willing and able to accept placement of the children.

¶ 64 The circuit court was notably concerned that the Agency, a DCFS provider, had limited its contact to the parents in order to locate relatives who might be willing to accept placement of the children. Once the KIND Act went into effect, the Agency was obligated to make efforts to locate family members who might be able to accept placement. DCFS, or its Agency provider, was required to conduct an investigation to identify and locate all the adult relatives of the children. 20 ILCS 505/7(b)(1) (West 2024). This investigation should have included a search for relatives, including those who may be disconnected from the child's parents, and this search should have occurred regardless of the information received from Father. See 20 ILCS 505/7(b)(1) (West 2024). Moreover, DCFS was obligated to keep detailed records of its efforts but was unable to add specifics for the circuit court when asked. Father, nevertheless, provided information to DCFS (the Agency) in July 2025 that he had family in Michigan who may be willing to accept placement of all three children together. The circuit court specifically directed the Agency to investigate options for out-of-state placement of the children with relatives in July 2025. The evaluation of an out-of-state relative placement required the Agency to utilize the Interstate Compact on Placement of

28

Children Act (45 ILCS 15/0.01 *et seq.* (West 2024)), which facilitates cooperation between states for the placement of children. Testimony revealed that the ICPC review could take from six to nine months.

¶ 65    At the hearing on September 11, 2025, Father requested his first continuance of the termination proceedings. The Agency had advised the circuit court that only one of four potential relative placements had been contacted, and only one phone call had been made to the three other potential placements. The September 2025 permanency report additionally revealed that the Agency did not intend to pursue relative placement at that time. The circuit court considered the Agency's efforts and found "that does not sound like due and diligent efforts to me on the part of the [A]gency to comply with the [KIND] Act." The circuit court was frustrated that no one from the Agency had detailed information on compliance with the KIND Act. The circuit court granted the motion to continue but indicated that it would not grant any further continuances. By indicating that there would be no further continuances, the circuit court ignored the reality that the ICPC process would take several additional months to be completed and set the termination hearing for November 6, 2025.

¶ 66    Father requested an additional continuance of the November 6, 2025, termination hearing due to ongoing issues with Agency compliance. At that time, the Agency had made contact with Erin, Father's relative in Michigan, who expressed an interest in having all three children placed in her care. A criminal background check was completed and there were no barriers found that would prevent Erin from being a relative placement for the three children. Furthermore, Erin lived with her sister and explained that there were additional relatives of the children who lived nearby Erin's residence.

29

¶ 67    The Agency was concerned with delaying permanency in the placement of the children due to the length of time required to process the ICPC request that was submitted on October 30, 2025. The reality was that the Agency had no intention of placing the children with Erin, even if she was considered a viable placement option. The permanency report made the Agency's position clear that it did not believe the best interests of the children would be served by moving them out of state. The State objected to continuing the November 6, 2025, termination hearing and argued that the circuit court previously determined that no further continuances would be granted. The GAL believed that "permanency is being hijacked because of the KIND Act." The arguments presented by the State and the GAL were contrary to the purpose of the KIND Act, which identifies that "[l]awyers and judges in juvenile court play a meaningful role in creating a kin-first culture. The juvenile court must have sufficient information at all stages of the process to provide essential judicial oversight of [DCFS's] efforts to contact and engage relatives." Pub. Act 103-1061, § 2 (eff. Feb. 5, 2025). Rather than continuing the termination hearing to require the Agency to complete the investigation of Erin, the circuit court denied the continuance as it related to the KIND Act and incredibly found that the Agency had met its obligations.

¶ 68    On December 11, 2025, the circuit court held the fitness portion of the termination proceeding. Father requested an additional continuance and noted that the ICPC had not been submitted until October 30, 2025, even though the Agency should have had sufficient information in July 2025 to locate Erin. Contrary to the KIND Act directive that the juvenile court promote and facilitate the opportunity for family placement, the circuit court considered that the delay attributable to the ICPC request was not in the best interest of the children and denied the motion to continue. The circuit court proceeded with the fitness portion of the termination proceeding, and Father was found unfit. The circuit court was ready to proceed to the best interest portion of the

30

termination hearing. Father, however, renewed his motion to continue and argued that the ICPC determination regarding placement of the children with Erin was relevant to the best interest hearing. The Agency, however, made it clear that it had no intention of placing the children together with Erin regardless of the outcome of the ICPC. The circuit court was so concerned with this representation that it asked the Agency's representatives whether they had consulted with their legal counsel in light of the mandate of the KIND Act and its placement considerations. The circuit court then granted the motion to continue in part due to Father's request and in part because it was too late in the day for the best interest hearing.

¶ 69    On January 8, 2026, before the circuit court began the best interest hearing, it requested a KIND Act status update from the Agency representatives. The Agency informed the circuit court that the ICPC request remained pending, but additional information had been requested. The Agency additionally acknowledged that it had not made any efforts to allow Erin to visit the children, even though she had been in southern Illinois to attend the court hearing, and no attempts to establish visitation had been pursued since then. The Agency maintained its recommendation that placement change should not be pursued as the children had been thriving in their current environments for a significant amount of time, and Erin did not have an existing relationship with the children. After apprising the circuit court of the minimal efforts it had taken pursuant to KIND Act and the failure to introduce Erin to the children, the circuit court moved on to the best interest hearing. Father's counsel did not renew his request for another continuance of the best interest hearing pending completion of the ICPC. Rather, Father indicated that he was ready to proceed to hearing.

¶ 70    Testimony was taken from the various individuals caring for the children. During the testimony of Murphy, the Agency supervisor, the circuit court asked Murphy whether she could

31

tell, based on her file, what efforts were made by the Agency to find a relative placement after the initial placement failed. Murphy indicated that in November 2024, the Agency spoke with the parents, and no relatives were identified who were potential caregivers. The circuit court followed up by asking whether the Agency records indicated that the potential caregiver could be a person outside of the State of Illinois. Murphy responded by stating, there was no documentation in her records that "explicitly states that we clarified out-of-state relatives could be included." The court then wanted to know if the Agency continued to inquire of the parents, and Murphy responded, "not at the consistency of regular monthly conversations with the parents."

¶ 71    Erin testified by videoconference. She indicated she resided in Michigan, in close proximity to other family members, including her adult son. Erin testified that she became aware Father's children had been removed and were placed with Father's grandmother. Erin indicated she would have been willing to take the children when they were removed, but thought they were placed with their great-grandmother, and if further placement was needed, she would be notified. She further indicated that she was not aware of any further need for placement until she heard from the Agency in October 2025. Erin asked the circuit court to consider her as a placement option for all three children, as she was willing to accept all three of them and could provide for them. On cross-examination, Erin admitted that she had not met the children; she had not provided for their food, shelter or clothing; and she had not assisted with the development of the children's sense of attachment or sense of being valued.

¶ 72    At the conclusion of testimony, the State requested that the circuit court enter the order terminating Father's parental rights. Father's counsel argued that the KIND Act required that the Agency show a preference for placing children with their biological family. He reminded the circuit court that as far back as January 2025, the court was concerned that the children had not

32

been placed together. Additionally, counsel argued that there were no barriers to Erin being accepted as a placement option, but the Agency had delayed in identifying, locating, and engaging Erin. As a result of the Agency's lack of diligence, the time intensive ICPC process was delayed. Father's counsel suggested that the circuit court allow the ICPC process "to play out" so a determination regarding the best interests of the children can be made.

¶ 73    As a part of its ruling, the circuit court first took into account the KIND Act and the DCFS part 415 guidelines (89 Ill. Adm. Code 415). The circuit court also went through the best interest guidelines as they pertained to the children and found that the best interests of the children required that Father's parental rights be terminated. In further support of its ruling, the circuit court went through a lengthy commentary on the issues that arose regarding the placement of these children. The court indicated this case was "unique" because the KIND Act went into effect in July 2025. Of note, however, was the fact that many portions of the KIND Act became effective in February 2025, and even before July 1, 2025, DCFS had internal guidelines that required the Agency to look for "familial placements first." The circuit court indicated that the KIND Act "gave the Court more authority" over reviewing whether the Agency was giving preference to familial placements. The court questioned whether circumstances would have been different relative to placement with Erin if the KIND Act would have been in effect "when the first relative placement was blown." During this analysis, the circuit court stated, "I have already previously found that there was not due diligent efforts or reasonable efforts on the part of the [A]gency with the KIND Act. I don't think they made good efforts at the beginning of this case." The circuit court continued its criticisms of the Agency, indicating, "I don't think they made clear to the parents throughout the case." With regard to whether the Agency fulfilled its obligation to assist the parents in understanding the importance of naming relative placement options, the circuit court noted, "And I find that the

33

[A]gency did very little to make inquiry, made very—made very little efforts to make clear to the parents so that they understood why it was important to give the names and that it didn't just need to be local names in the case." Once Father identified relatives in Michigan, the circuit court commented that, "I don't think the [A]gency clearly followed up with the relatives whose names they were given to ask them about other relatives because if they had done so, they would have been given [Erin's] contact information much earlier in this case."

¶ 74　With these repeated criticisms of the Agency, it is clear that the circuit court was frustrated with the Agency's failure to make diligent efforts with family finding and relative engagement and the Agency's failure to follow its own internal guidelines. The circuit court qualified its findings by indicating, specifically, that it was not directing placement of the minor children. "Those are primarily administrative and [A]gency issues, and [Erin] may have issues there that she wants to address with the [A]gency administratively." Although this finding offered some relief to Erin, it was ultimately empty, since the circuit court had no further say in the children's placement after issuing the order. The written order terminating Father's parental rights was entered on January 8, 2026.

¶ 75　Father appeals the entry of the termination order entered January 8, 2026. His argument on appeal, however, is that the circuit court abused its discretion when it failed to continue the hearing regarding Father's termination. "At the unfitness hearing, the focus is on the parent's conduct relative to the ground or grounds of unfitness alleged by the State." *D.T.*, 212 Ill. 2d at 364. In the present case, the State asserted that Father was unfit because he failed to protect the minors from conditions within their environment injurious to their welfare, he failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors from the parents, and he failed to make reasonable progress toward the minors' return. "The trial court is not permitted to

34

consider the child's interests." *D.T.*, 212 Ill. 2d at 364. Father requested continuance, citing DCFS's noncompliance with the KIND Act. The motion to continue, if granted, would not have affected the evidence favorable to Father during the fitness hearing. Therefore, it was not an abuse of discretion to deny the motion to continue.

¶ 76    Father simply argues that he should be allowed some input into whether the provisions of the KIND Act are complied with, as the Agency's development of information regarding a familial placement may bear on the best interest determination to be made by the circuit court. This argument raises the question of whether a parent has a right to seek a continuance of a termination hearing on the basis of the Agency's noncompliance with the KIND Act. Before we respond to this question, we note the corollary to this question is, if a parent does not have the right to enforce compliance, does the circuit court have the authority to force the Agency's compliance with the KIND Act. Here, the circuit court was exceptionally critical of the Agency in its mishandling of the obligations of investigating familial placements, engaging with the parents, and documenting the efforts made to pursue placement of the children with a preference for biological relatives. Despite these very significant oral findings, the January 8, 2026, written decision, found that the Agency made diligent and reasonable efforts to engage in ongoing family finding and relative engagement. In fact, the circuit court excused any further efforts by the Agency "because they are futile or not in the minor's best interest." It is difficult to understand how to relate the circuit court's criticisms of the Agency on the record with the written order entered, as both cannot be true, simultaneously. So, while we recognize that the KIND Act "directs the juvenile court to provide necessary oversight of DCFS's obligations to maintain family connections and promote equitable opportunities for youth and families to thrive with relational permanence," the circuit court turned a blind eye and did not accept responsibility to enforce the KIND Act.

35

¶ 77    In our view, under the totality of the circumstances, the written order of January 8, 2026, must be affirmed. Father's counsel made motions for continuance on November 6, 2025, and December 11, 2025, to defer the termination proceedings, claiming that the Agency had not complied with the KIND Act. Notably, Father claimed the ICPC proceeding that was started in October 2025, had been delayed by the Agency's inaction. The circuit court denied the November 6, 2025, request for continuance of the termination hearing, although the hearing was reset for December 11, 2025, due to time constraints. At the hearing on December 11, 2025, Father renewed his motion to continue the termination hearing, and the circuit court denied that motion and held the fitness hearing. After Father was found unfit, he requested another continuance, to reset the best interest portion of the termination proceeding. The circuit court granted Father's motion in part but also had to reschedule the hearing due to the court's docket. We note that the circuit court never continued the proceedings a sufficient amount of time to allow for the ICPC process to be completed, despite the fact that the circuit court was not satisfied with the Agency's diligence. But Father did not renew his motion to continue on January 8, 2026, and indicated to the circuit court he was ready to proceed. Therefore, we cannot find it was an abuse of discretion for the circuit court to proceed with the best interest hearing, nor can we offer an explanation regarding why the circuit court's criticisms did not carry over to enforcement of the KIND Act against the Agency. We need not answer this additional query of whether Father had a right to enforce the KIND Act, as this question has not been properly raised on appeal.

¶ 78    Finally, we note the dilemma created by the circumstances of this case, as the KIND Act raises the question of who has the right, or even the obligation, to enforce the Act. Perhaps the answer to this question is better left to the legislature, as it cannot be decided here. Because Father did not raise his motion for continuance again at the January 8, 2026, hearing, the circuit court did

not abuse its discretion in proceeding with the best interest hearing. The order of January 8, 2026, is affirmed.

¶ 79                                        III. CONCLUSION

¶ 80    For the foregoing reasons, the written order of January 8, 2026, terminating Father's parental rights is affirmed.

¶ 81    Affirmed.

*In re A.H.*, 2026 IL App (5th) 260027

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Williamson County, Nos. 24-JA-20, 24-JA-21, 24-JA-22; the Hon. Amanda Byassee Gott, Judge, presiding. |
| **Attorneys for Appellant:** | Angela J. Reaney, of Christopher, for appellant. |
| **Attorneys for Appellee:** | Theodore Hampson, State's Attorney, of Marion (Patrick Delfino, Patrick D. Daly, and Max C. Miller, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |